In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.

In re Adelphia Communications Corp., et al., Plaintiff–Debtors,

v.

Associated Electric & Gas Insurance Services, Ltd., Federal Insurance Company, and Greenwich Insurance Company, Defendants.

In re Adelphia Business Solutions, Inc., et al., Debtors.

In re Adelphia Business Solutions, Inc., et al., Plaintiff–Debtors,

v.

Associated Electric & Gas Insurance Services, Ltd., Federal Insurance Company, and Greenwich Insurance Company, Defendants.

Bankruptcy Nos. 02–41729(REG), 02–11389(REG).
Adversary Nos. 03–09580, 03–92593.

United States Bankruptcy Court, S.D. New York.

Dec. 5, 2003.

440

Boies, Schiller & Flexner LLP, by Eric Brenner, Philip C. Korologos, Armonk, NY, Co-counsel for Debtors in Adelphia Communications Corp. Case.

Kasowitz, Benson, Torres & Friedman LLP, by Daniel N. Zinman, New York City, for Creditors Committee in Adelphia Communications Corp. Case.

Weil, Gotshal & Manges LLP, by Miranda S. Schiller, Judy G.Z. Liu, New York City, for Debtors in Adelphia Business Solutions Case.

Akin, Gump, Strauss, Hauer & Feld LLP, by Ira S. Dizengoff, Shuba Satyaprasad, New York City, for Secured Noteholder Committee in Adelphia Business Solutions Case.

Dilworth Paxson, LLP, by Lawrence G. McMichael, J. Bradford McIlvain, Philadelphia, PA, for Rigas Family.

Bailey Cavalieri LLC, by Michael R. Goodstein, Columbus, OH, for Associated Electric & Gas Insurance Services Limited.

Hogan & Hartson LLP, by Peter R. Bisio, New York City, for Federal Insurance Company.

Ross, Dixon & Bell LLP, by Leslie S. Ahari, Washington, DC, for Greenwich Insurance Company.

*DECISION ON MOTIONS FOR PRELIMINARY INJUNCTIONS TO STAY PROCEEDINGS IN D & O POLICIES DECLARATORY JUDGMENT ACTION*

ROBERT E. GERBER, Bankruptcy Judge.

In these two adversary proceedings—under the umbrella of the separately administered chapter 11 cases of Adelphia Communications Corporation and its sub-

sidiaries ("ACC"), and Adelphia Business Solutions, Inc., and its subsidiaries ("ABIZ"), respectively—each of the plaintiffs ACC and ABIZ moves for a preliminary injunction. Each asks this Court, pursuant to Bankruptcy Code section 105(a), to stay a declaratory judgment action in the Eastern District of Pennsylvania (the "Declaratory Judgment Action"), in which neither is named as a defendant, seeking declarations that:

(1) the D & O carriers are not liable for loss or defense costs with respect to claims against John, Timothy, Michael and James Rigas (the "Rigases")—all of whom have been civilly charged with fraud arising out of their management of ACC, and three of whom are subject to ongoing criminal proceedings in that regard—and

(2) two of the three Directors and Officers insurance policies ("D & O Policies") covering ACC, ABIZ, and *all* of their officers and directors—not just the Rigases—have been rescinded as a result of fraud.

Issues to be decided in the Declaratory Judgment Action would affect the extent to which the D & O Policies will cover the costs of defense and any possible judgments in the many civil lawsuits (now more than 40) that have been commenced against the Rigases and independent directors of ACC.[1] But significantly—and explaining why so much litigation has taken place in this Court with respect to these matters—those and related issues also would affect matters of concern to the Debtors ACC and ABIZ themselves: (1) the ability of ACC to draw upon its "entity coverage" under the D & O Policies in connection with a chapter 11 plan; (2) prejudice to ACC and ABIZ if there were to be a decision in the Declaratory Judgment Action rescinding the D & O Policies; and (3) prejudice to ABIZ, in particular, by an uncontrolled draw on proceeds of the D & O Policies, which as a practical matter would destroy the policies, in the face of undisputed evidence that ABIZ needs those policies and cannot secure replacements for them.

The extent to which Bankruptcy Code sections 362 and 105(a) apply or can be used to protect ACC and ABIZ from prejudice in the latter respects is once more before this Court, on a remand from the District Court. In an earlier decision,[2] this Court held that under the facts of these cases (which included, among other things, that the policies provided indemnification and entity coverage to ACC and ABIZ, and that unfettered access to policy proceeds would destroy the policies themselves for ABIZ), both the policies themselves and their proceeds constituted property of the estate, protected by section 362 of the Bankruptcy Code. Additionally, insurer efforts to rescind the D & O Policies would destroy the policies themselves, even if policy proceeds were not property of the debtors' estates. Thus, this Court held, continuation of the Declaratory Judgment Action was subject to section 362's automatic stay. After consideration of the Second Circuit's *Sonnax* factors,[3] this Court denied relief from the stay to litigate the Declaratory Judgment Action, in order to protect interests in the policies

**1.** Dennis P. Coyle, Leslie J. Gelber, Erland E. Kailbourne, and Pete J. Metros (the "Independent Directors").

**2.** *Adelphia Communications Corp. v. Associated Electric & Gas Insurance Services Ltd.* (*In re Adelphia Communications Corp.*), 285 B.R. 580 (Bankr.S.D.N.Y.2002) (the "Initial Decision").

**3.** *See Sonnax Industries, Inc. v. Tri Component Products Corp.* (*In re Sonnax Industries, Inc.*), 907 F.2d 1280, 1286 (2d Cir.1990) ("Sonnax").

and their proceeds which ACC and ABIZ shared with their officers and directors, but this Court permitted consensual access to policy proceeds to the extent of $300,000 per insured, without prejudice to further requests.

Upon an appeal by the Rigases, this Court's decision was vacated by the District Court.[4] The District Court disagreed with this Court's conclusion that under the facts of these cases, the proceeds were property of the estate. It remanded for this Court to make supplemental determinations as to matters this Court had concluded, in the Initial Decision, that it did not need to address, as relevant to an analysis that might lead to the same result—whether an injunction to "extend the automatic stay"[5] should be issued under Bankruptcy Code section 105(a).

Because seeking relief under 105(a) would require commencing an adversary proceeding and then seeking an injunction (as compared and contrasted to requests for relief under section 362, which is self-effectuating, and requires neither), ACC and ABIZ have commenced the necessary adversary proceedings to do so, and have filed preliminary injunction motions. While the ACC and ABIZ adversary proceedings and preliminary injunction motions are separate, they are very similar. Each Debtor seeks a preliminary injunction under section 105(a) of the Bankruptcy Code extending the automatic stay to preserve its interests and rights in the D & O insurance *policies*—which undisputedly are property of the debtor estates—and to effect its reorganization. The insurers on the D & O Policies' primary and two excess layers, who commenced the Declar-

atory Judgment Action,[6] do not oppose the ACC and ABIZ motions, though they raise concerns as to the fairness to the Insurers if this Court were to grant part, but less than all, of the requested relief.

However, just as they opposed this Court's determination with respect to section 362 itself, the Rigases oppose the pending motions and reliance on section 105(a)—except that the Rigases do not oppose (and indeed urge) a stay of deposition discovery in the Declaratory Judgment Action. The Rigases wish, in the Declaratory Judgment Action, (1) to move to dismiss claims by the Insurers seeking to rescind the D & O Policies; and (2) to move for an order requiring the Insurers to advance the Rigases' defense costs before the conclusion of legal proceedings that would determine whether or not the Rigases are covered under the D & O Policies—though the Rigases declare that (for the time being) they are willing to abide by the $300,000 per insured limit that this Court imposed as part of the Initial Decision.

On remand, the Court now considers whether relief is available under section 105(a), within the constraints imposed by the District Court in its ruling. Having done so, the Court finds that it can, and should, grant part of the relief requested, but that principles articulated by the District Court, which are binding on this Court in the ACC and ABIZ cases, constrain this Court, and prohibit this Court from staying the Declaratory Judgment Action to the extent it previously was stayed.

**4.** In re Adelphia Communications Corp., 298 B.R. 49 (S.D.N.Y.2003) (the "District Court Decision").

**5.** Id. at 54.

**6.** Associated Electric & Gas Insurance Company ("AEGIS"), Federal Insurance Co. ("Federal"), and Greenwich Insurance Co. ("Greenwich," and together with AEGIS and Federal, the "Insurers").

For those reasons, and those set forth below, the Court:

(1) Stays proceedings in the Declaratory Judgment Action insofar as they relate, in any way, to requests for rescission of the D & O Policies (and thus the Court stays motions by the Rigases to dismiss Insurers' rescission claims)—as doing so is necessary and appropriate to aid in the reorganization of the Debtors ACC and ABIZ, and to protect the property interests of the Debtors ACC and ABIZ in the *policies,* even if their proceeds are not protected by the automatic stay; and

(2) Stays deposition discovery in the Declaratory Judgment Action—as doing so is necessary and appropriate to protect ACC and ABIZ from adverse consequences that could attach if the Rigases were required to testify in the Declaratory Judgment Action and then took the Fifth Amendment; but

(3) Denies a stay of the Declaratory Judgment Action otherwise—because this Court is bound by the mandate and logic underlying the decision of the District Court, which impair this Court's ability to protect policy *proceeds,* and because commitments by the Rigases to abide by the Court's $300,000 per insured limitation on access to proceeds foreclose any present threat to the policies themselves.

Each of the foregoing is subject to modification and/or reconsideration at the conclusion of the criminal trials involving John, Timothy and Michael Rigas, or in the event of a modification of the mandate by the district or any higher court.

The following are the Court's Findings of Fact, Conclusions of Law and bases for

the exercise of its discretion in connection with its ruling.

*Facts*

The facts found by this Court in the Initial Decision (none of which were held by the District Court to be clearly erroneous) are incorporated by reference, and will not be repeated at comparable length here. But the Court believes it necessary to emphasize and expand upon some of them, and to note facts that are new since the time of issuance of the Initial Decision.

*The D & O Policies*

ACC and ABIZ, its former subsidiary, share three D & O Policies—a "primary" policy and two excess policies—with an aggregate $50 million limit, issued by the Insurers. The policies cover the two types of loss that most commonly are covered in policies of this character: (1) defense costs, and (2) actual liability for allegedly wrongful conduct.

But the D & O Policies also provide "indemnification coverage," indemnifying the Debtors for payments they might make for covered matters to their officers and directors, under corporate charter, by-laws and the like. And they also provide so-called "entity coverage," under which the Insurers would make payment for liability of ACC or ABIZ for violations of the federal securities laws.

*Payments on Account of Indemnification and Entity Coverage*

As the District Court noted in its decision,[7] and this Court found in its earlier Findings of Fact in the Initial Decision,[8] the Debtors have not yet made any payments for which either would be entitled to indemnification coverage, nor are any such payments now contemplated. Likewise, neither Debtor has yet made or committed

7. See 298 B.R. at 53.

8. See 285 B.R. at 587.

itself to payments using its entity coverage.

However, this Court additionally notes certain basic principles of bankruptcy law which set the context for those factual findings. Here, as in many (if not most) chapter 11 cases, claims by officers or directors for indemnification, for which the debtors might then seek reimbursement from their insurers, would be pre-petition claims. And claims against the debtors for securities fraud of the type that has been alleged here, which the entity coverage would cover, would likewise be pre-petition claims. None of the Debtors could make payments on account of such pre-petition claims except under a chapter 11 plan.

Thus it is not readily apparent, in light of bankruptcy law and practice, that there would be any occasion upon which such payments would *ever* be made during the pendency of a chapter 11 case. The more likely scenario, if not the only one, is that a debtor whose entity coverage provided a means to satisfy, in part, its liability to creditors or equity security holders would wish to use its entity coverage as one of the funding sources for its chapter 11 plan. ACC in particular has potential liability for which the entity coverage would be relevant. Obviously, if the policy proceeds were to be depleted before ACC could avail itself of that opportunity, its ability to utilize that funding source would be lost.

The loss of this funding source—whether or not it is "property"—would impair the ability of ACC to reorganize.

*Efforts to Rescind the Policies*

As previously noted, two of the three Insurers—the excess carriers Federal and Greenwich—wish to do more than disclaim coverage for those directors and officers with respect to whom they contend that their policy exclusions apply. Federal and Greenwich also wish to rescind the policies themselves. In September 2002, the In-

surers filed lift stay motions in this Court seeking relief from the automatic stay, "to the extent applicable," so that they could provide ACC and ABIZ with notices of rescission of the policies and join ACC and ABIZ as defendants in the Declaratory Judgment Action.

As part of its Initial Decision, this Court held that the automatic stay was indeed applicable to any effort on the part of the Insurers to rescind the D & O Policies, and after consideration of the *Sonnax* factors, it further held that relief from the stay to rescind the policies should be denied at this time. At least insofar as the Insurers sought to deprive ACC and ABIZ of their policies, no one appears to have quarreled with either of these results.

The estates of each of ACC and ABIZ are more valuable with the policies than without them, and the policies themselves have value to each of ACC and ABIZ.
*Effect on ABIZ and its Ability to Reorganize*

Though the Court made many of the findings that follow before (as then relevant to whether unrestricted access to policy proceeds would destroy the policies themselves), these findings are also relevant to ability to reorganize, and thus are noted again.

Because the D & O Policies are subject to an "aggregate limit," which includes all payments made by the Insurers on behalf of the insureds, each dollar paid out of the D & O Policies for attorneys' fees, settlements, judgments or indemnification on behalf of any insured person leaves one dollar less for other payments under the D & O Policies. That is a matter of concern for ABIZ, which does not now have litigation pending against its officers and directors (other than the Rigas Insureds, who have been sued with respect to their activities at ACC), and which needs D & O

coverage on a continuing basis to retain its independent directors and to reorganize. ABIZ stated, without contradiction, and the Court once more finds as a fact, that

ABIZ's outside directors will not continue to serve on its Board of Directors if ABIZ has no D & O insurance, particularly in the current legal environment with dozens of shareholder actions pending against the former ACC directors. ABIZ has been unable to locate another carrier willing to underwrite a claims made D & O policy insurance policy for ABIZ which provides coverage similar to the AEGIS Policy ... The lack of D & O coverage presents an even greater problem for ABIZ because it has limited financing available with which to indemnify its outside directors if they incur losses from claims related to their actions as ABIZ directors.[9]

This Court accepts that assertion as true, and additional facts ABIZ noted on this motion. An endorsement to the AEGIS policy provides ABIZ with a right to up to 24 months of "tail" coverage, through December 31, 2005, in exchange for an additional premium. Given ABIZ's inability to procure D & O insurance, and, in particular, coverage for events that took place prior to the Rigases' resignation from the boards of directors of ABIZ and ACC, the right to tail coverage is a valuable right. The Court accepts ABIZ's assertion that the cost of defending against investor actions can run in the many millions of dollars, even when such actions lack merit, and that a fledgling company like ABIZ that is on the cusp of emerging from chapter 11 and getting a fresh start should not expose itself to a catastrophic risk of loss that could wipe out the company when it has the ability to protect itself against such risk by maintaining its D & O insurance.

In this connection, the Court underscores its earlier factual findings, and then supplements them. If the D & O Policies are rescinded by the Insurers, the right to continued coverage is worthless. Similarly, unrestricted access to policy proceeds will fully deplete their coverage, *and effectively destroy the policies* for ABIZ. ABIZ needs these policies to reorganize, as it cannot reorganize without independent directors; independent directors will not serve unless they have comfort that their needs and concerns for D & O indemnification have been satisfactorily funded; and ABIZ cannot provide them with the coverage they would justifiably expect without the D & O Policies in question here. ABIZ would be prejudiced, irreparably, if the policy proceeds are exhausted, because it will lose the benefits of the policies themselves, and has no means to replace them. Also, assuming that only *policies* are property under the Bankruptcy Code, and not their proceeds, the interest of ABIZ in its *policies* is materially and irreparably threatened by unrestricted access to policy proceeds.

The needs and concerns of ABIZ in this respect were addressed by this Court's earlier limitation of access to policy proceeds to $300,000 per insured, as the aggregate proceeds that would thereby be depleted under the policies would presumably not exceed $3 million of the total $50 million. And even if those now named as defendants were to seek reasonable increases in that limit, or additional directors or officers were to be named as defendants and seek payment under the policies, there would be no apparent material threat to using up the proceeds. The Rigases have stated that they are willing to abide by the $300,000 limitation for the time being, without prejudice to the right to seek a

---

9. Oct. 28, 2002 ABIZ Memo at ¶ 3.

greater amount, or to have all restrictions lifted at a later time. The District Court Decision had the effect of lifting this Court's $300,000 limitation, though all directors and officers (including, as noted, the Rigases) have so far been willing voluntarily to adhere to it.

### Criminal and SEC Proceedings

On July 24, 2002, the United States Department of Justice instituted criminal proceedings against John, Timothy and Michael Rigas, James Brown, and Michael Mulcahey. The criminal trial is now scheduled to begin in January 2004.

The United States Government, on the one hand, and the Rigases, on the other, each have had an interest in controlling civil litigation in this and other courts to avoid actual or perceived prejudice in the criminal trial here. The Government has sought to intervene in proceedings in the Bankruptcy Court, to avoid subjecting its criminal trial witnesses to discovery that would not be authorized in a criminal case; the Rigases have wished to avoid prejudice as a consequence of their invocation of Fifth Amendment rights. This Court has strived to balance the needs and concerns of those parties, along with others, in its stewardship of the umbrella ACC and ABIZ cases and related adversary proceedings. The concerns to be addressed, and this Court's efforts to address them, are set forth in more detail in two other of this Court's decisions,[10] and need not be addressed at comparable length here.

### Developments After The Initial Decision

After the Initial Decision was issued, the Rigases each requested an advance from AEGIS of up to $300,000 in defense costs.

In a November 2002 letter, AEGIS reaffirmed its prior decision (1) to rescind the D & O Policies with respect to the Rigases, and (2) alternatively, to deny coverage under the D & O Policies under their policy exclusions. It also rejected the Rigases' contention that the Insurers were required to pay defense costs on a current basis until there was a judicial determination that the Rigases were *not* entitled to coverage.

In July 2003, the Rigases moved to modify temporary restraining orders freezing their assets that had been previously issued by this Court to permit funding of their criminal (and to a lesser extent civil) defense costs from "Managed Entities"— companies owned by the Rigases (though subject to claims by ACC and ABIZ) that are managed by ACC. ACC opposed access by the Rigases to these funds, but this Court permitted such access, in a ruling on August 7, 2003. After an appeal by ACC of this Court's order granting the Rigases access to funds of the Managed Entities, ACC and the Rigases entered into a stipulation, so ordered by this Court, providing for the Rigases to receive up to $15 million in funds from the Managed Entities for their defense costs.

During a telephone conference on September 2, 2003, counsel for the Rigases stated that "at present there is no immediate urgency to resolving these [D & O insurance] issues." [11]

### Irreparable Injury and Balance of Hardships

■ Though as noted by the District Court, and below, the issuance of injunctions under section 105(a) does not require

---

10. *See Adelphia Communications Corp. v. Rigas (In re Adelphia Communications Corp.),* 293 B.R. 337 (Bankr.S.D.N.Y.2003) (staying discovery in state court action under SLUSA amendments to 1934 Act); *Adelphia Communications Corp. v. Rigas (In re Adelphia Com-*munications Corp.), 294 B.R. 39 (Bankr. S.D.N.Y.2003) (declining to stay other discovery in state court action).

11. Sept. 2, 2003 Tr. at 21.

the injunction applicant to make all of the showings customarily required for a preliminary injunction, this Court nevertheless considers the nature of the relevant injury and balance of hardships whenever it is asked to issue an injunction. Here the Court finds that ACC and ABIZ would suffer irreparable injury if the D & O Policies were rescinded or effectively destroyed, and that the balance of hardships favors ACC and ABIZ.

In light of the stipulation, and their counsel's acknowledgement, the Court sees little prejudice to the Rigases if the Declaratory Judgment Action does not immediately proceed—especially if, as is to be expected, the court in the Declaratory Judgment Action is not in a position to drop the other matters on its docket to more quickly decide issues relating to the D & O Policies. That is particularly so since the Rigases themselves do not favor any proceedings in the D & O action that would require consideration of the Rigases past conduct before the criminal cases are tried, by reason of their likely invocation of the Fifth Amendment. ACC, which has

pending, in this Court, its own litigation against the Rigases, has accepted a rather slow pace in that litigation while the criminal proceedings are ongoing, which prejudices ACC, but only mildly. But ACC and ABIZ would be prejudiced to a much greater degree—and irreparably—if they were to suffer the rescission of the D & O Policies, or if they were to suffer adverse consequences as to their D & O Policies as a result of the invocation by the Rigases, against whom ACC itself has asserted claims, of rights under the Fifth Amendment.

### The District Court Decision

As previously noted, upon an appeal by the Rigases [12] this Court's Initial Decision was vacated by the District Court,[13] whose decision is now binding on this Court in the ACC and ABIZ cases. The District Court agreed with this Court's determination that the D & O Policies were property of the estate.[14] But impliedly disagreeing with the cases upon which this Court had relied;[15] considering other cases to hold to

**12.** None of the other parties appealed. ACC, ABIZ and the Insurers sought to defend the Initial Decision on appeal.

**13.** *See* District Court Decision, 298 B.R. at 51.

**14.** *See* District Court Decision, 298 B.R. at 52–53 ("It is well settled that insurance *policies* are covered by the automatic stay provision of the Bankruptcy Code") (emphasis in original).

**15.** *See Homsy v. Floyd (In re Vitek)*, 51 F.3d 530, 535 (5th Cir.1995) (*"Vitek"*) ("when a debtor corporation owns an insurance policy that covers its own liability *vis-a-vis* third parties, we—like almost all other courts that have considered the issue—declare or at least imply that both the policy *and the proceeds* of that policy are property of the debtor's bankruptcy estate.") (emphasis in original); *In re Sacred Heart Hospital of Norristown*, 182 B.R. 413, 419–420 (Bankr.E.D.Pa.1995). (*"Sacred Heart Hospital"*) ("Proceeds available for the Debtor's liability exposure are not segregated

from the Proceeds available to the directors and officers. Thus, the Debtor is indeed an insured and has a sufficient interest in the Proceeds as a whole to bring them into the estate."); *In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 785 (Bankr.S.D.N.Y.1997) (Brozman, C.J.) (*"Leslie Fay"*) ("a shared interest in the insurance proceeds was sufficient to bring those proceeds into the estate, irrespective of whether those policies also provided liability coverage for the debtor's directors and officers."); *In re CyberMedica, Inc.*, 280 B.R. 12, 16–17 (Bankr.D.Mass.2002) ("This Court adopts the logic of the cases holding that D & O insurance proceeds are property of the estate. There is a fundamental test that has been used in determining whether or not property belongs to the estate and that test is whether 'the debtor's estate is worth more with them then without them.' This Court finds that the D & O Policy is of benefit to the estate since the estate is worth more with it than without it because it insures the Debtor against indemnity and entity claims, *see In re*

the contrary;[16] and stating that the issue was one of first impression in the Second Circuit,[17] the District Court reversed this Court's legal determination that under the facts of these cases (where the D & O Policies provided both indemnification and entity coverage, and uncontrolled access to proceeds would effectively destroy the policies for ABIZ), the proceeds were property of the estate. Finding it significant that ACC and ABIZ had not yet expended funds that would entitle them to indemnification under the D & O Policies' indemnification provisions, and that ACC and ABIZ had not yet committed to use their entity coverage, the District Court concluded that the policy proceeds, which could be used for such purposes, did not rise to the level of property of the estate. It stated:

> Here, as far as I can tell, Adelphia does not have a property interest in the proceeds of the insurance policies yet. Although the D & O policies reimburse each estate to the extent that the estate advances funds because of the indemnification obligations in the charter or by-laws, *see* [Initial Decision,] 285 B.R. at 592, "[i]t has not been suggested that any of the Debtors has made any payments for which it would be entitled to indemnification coverage, or that any such payments are now contemplated," *id.* at 587. Furthermore, "none of the Debtors [have] made or committed

themselves to payments using their entity coverage." *Id.*[18]

It remanded for this Court to make supplemental factual findings, as to a matter this Court had concluded that it did not need to address, as relevant to a matter that would lead to the same result—whether an injunction is appropriate under Bankruptcy Code section 105(a). It noted, in that connection:

> The fact that the stay under 11 U.S.C. § 362(a)(3) may not apply automatically does not render the Bankruptcy Court's decision to stay litigation between the Rigases and the insurers necessarily subject to reversal. Section 105 of the Bankruptcy Code provides Bankruptcy Courts with broad discretion to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. It is well settled that Bankruptcy Courts, under this provision, may extend the automatic stay to "enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts."[19]

The District Court continued that although section 362 stays generally apply only to bar proceedings against the debtor, they may be extended under certain circumstances, and that the proof required to

---

*Minoco Group of Cos. Ltd.,* 799 F.2d at 519, and is therefore part of the bankruptcy estate.") (citation omitted).

**16.** The District Court cited *In re Louisiana World Exposition,* 832 F.2d 1391 (5th Cir. 1987); *In re Youngstown Osteopathic Hosp. Ass'n,* 271 B.R. 544 (Bankr.N.D.Ohio 2002); *In re CHS Electronics, Inc.,* 261 B.R. 538 (Bankr.S.D.Fla.2001); *In re Daisy Sys. Sec. Litig.,* 132 B.R. 752 (N.D.Cal.1991); *In re Zenith Labs., Inc.,* 104 B.R. 659 (D.N.J.1989).

**17.** *See* District Court Decision, 298 B.R. at 53 ("Neither I, nor any of the parties have locat-

ed any decision by the Second Circuit on this subject, and thus the issue appears to be one of first impression in this Circuit"). There was, however, relevant authority in the Southern District of New York; this Court had held as Chief Judge Brozman did, in *Leslie Fay,* a case not addressed by the District Court.

**18.** 298 B.R. at 53 (probable typographical error corrected).

**19.** *Id.* at 54 (quoting *In re Granite Partners, L.P.,* 194 B.R. 318, 337 (Bankr.S.D.N.Y.1996)) (Bernstein, C.J.).

extend the stay is not as rigorous as that normally required for injunctions:

Because the "basic purpose of [§ 105(a)] is to enable the court to do whatever necessary to aid its jurisdiction, *i.e.,* anything arising in or relating to a bankruptcy case," *In re Neuman,* 71 B.R. at 571 (quoting 2 Collier on Bankruptcy ¶ 105.02 at 105–3 (15th ed.Supp.1986)), the Second Circuit, courts in this District, and courts in other circuits have "construed [§ 105] liberally to enjoin suits that might impede the reorganization process." *Johns–Manville,* 837 F.2d at 93, and embraced the use of § 105 without proof of all four factors normally required for injunctions, such as inadequate remedy of law or irreparable harm.[20]

Though it regarded section 362 to be inapplicable, the District Court remanded for this Court to determine whether the facts here warranted an injunction under section 105(a).

### Discussion
*Power to Enjoin Declaratory Judgment Action Under Section 105(a)*

Bankruptcy Code section 105(a) provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

As the District Court noted, it is well settled that Bankruptcy Courts, under this provision, may extend the automatic stay to "enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts."[21] The power of this Court to issue an injunction under such circumstances is unquestioned, even by the Rigases.[22] This Court thus must determine whether the Declaratory Judgment Action, or any aspect of it, threatens such a result.

*Ability to Stay Under These Facts*

#### 1. Rescission of the Policies

Here it is plain that aspects of the Declaratory Judgment Action do indeed threaten to thwart or frustrate the reorganizations of each of ABIZ and ACC. As noted above, two of the three carriers (rep-

**20.** 298 B.R. at 54 (citing *In re Johns–Manville,* 837 F.2d at 93; *Fisher v. Apostolou,* 155 F.3d 876, 882 (7th Cir.1998); *In re Granite Partners,* 194 B.R. at 337 ("*Manville* ... stand[s] for the proposition that the court can and should enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts."); *In re Neuman,* 71 B.R. at 571–72; *In re Chateaugay,* 93 B.R. at 29).

**21.** District Court Decision, 298 B.R. at 54. It further noted that "when the stay does not apply automatically, the debtor then bears the burden of demonstrating that circumstances warrant extending the stay." *Id.,* citing *In re Third Eighty–Ninth Assocs.,* 138 B.R. 144, 146 (S.D.N.Y.1992).

**22.** As noted above, when an injunction is sought under section 105(a), it may be used to stay suits that threaten to impede or frustrate the debtor's reorganization efforts, even without proof of all of the factors normally required for injunctions. Nevertheless, this Court notes that as set forth above in its discussion of the facts, it has found irreparable injury on the part of ACC and ABIZ, and a dramatic tipping of the equities in their favor. It also finds, as a conclusion of law, that to the extent discussed below, ACC and ABIZ have shown an absolute entitlement to an injunction, and not just a likelihood of success or serious issues going to the merits.

resenting $25 million of the $50 million in coverage) wish to rescind the policies, and seek a declaratory ruling in the Declaratory Judgment Action that they have the right to do so—not just as against the Rigases, but also as against other officers and directors, and against ABIZ and ACC. This Court held, in the Initial Decision (in a portion with which the District Court did not disagree) that:

> Here one purpose of the Declaratory Judgment Action is rescission of the D & O Policies, as against each of the debtors ACC and ABIZ, which would have both the purpose and effect of bringing the policies to an end.... *See Minoco,* 799 F.2d at 519 (affirming determinations by Bankruptcy Court and District Court that cancellation of D & O policy was stayed under section 362(a)(3)). Litigants may debate, if relief from the stay is sought in a given case, whether relief should be granted, but this Court agrees with the *Minoco* court that section 362(a)(3) applies, and that litigation to cancel or rescind a policy requires an application for relief from the stay.[23]

The District Court agreed with this Court's conclusion that the D & O policies were property of the two debtor estates.[24] Whether or not it would also follow that litigation to rescind the policies against ACC and ABIZ (and thereby to destroy their property) would be barred by section 362, it seems clear to this Court that the District Court would agree that, consistent with its mandate, this Court could take steps to protect the *policies,* if, as this Court has found, the loss of those policies—Debtor property—would be detrimental to their reorganization.

This Court has found as facts that the D & O Policies have value to each of the ACC and ABIZ estates;[25] that the loss of the entity coverage funding source— whether or not it is "property"—would impair the ability of ACC to reorganize;[26] and that the loss of the D & O Policies by ABIZ (which, without dispute, ABIZ needs and cannot replace) would impair the ability of ABIZ to reorganize.[27] In this Court's view, any actions in the Declaratory Judgment Action that could materially jeopardize the ability of ACC and ABIZ to protect those interests would impair their ability to reorganize. Section 105(a) relief is both necessary and appropriate at least to that extent.

Separate issues exist with respect to efforts by the Insurers to litigate the matter of rescission of the D & O policies as against ACC and ABIZ, and such efforts as against the Rigases and others.

With respect to the former, since the District Court agreed with this Court that D & O *"policies* are covered by the automatic stay,"[28] this Court believes it likely that the District Court did not intend to reverse this Court's ruling that section 362 protects the interests of ACC and ABIZ in the policies themselves, and would prohibit efforts by the Insurers to rescind the D & O Policies as against ACC and ABIZ.[29] But

---

23. 285 B.R. at 590.

24. See 298 B.R. at 52–53 ("It is well settled that insurance *policies* are covered by the automatic stay provision of the Bankruptcy Code....") (emphasis in original).

25. See page 10 above.

26. See page 10 above.

27. See page 12 above.

28. 298 B.R. at 52 (emphasis in original).

29. While, in one place in the District Court Decision, the "Bankruptcy Court's order [was] vacated" without stated exceptions; 298 B.R. at 51; in other place "the Bankruptcy Court's order *to stay litigation by the Rigases* ... [was] vacated...." *Id.* at 55.

for the avoidance of doubt, this Court holds that to the extent section 362 does not otherwise apply to stay any acts by the Insurers (including litigation) seeking to rescind the D & O policies against ABIZ and ACC, this Court enjoins any and all such acts. This is necessary to avoid the destruction of the property of ABIZ and ACC, and to protect them from an impairment of their ability to reorganize.

With respect to the latter—efforts to rescind as against the Rigases and others, and efforts by the Rigases to move to dismiss claims by the Insurers that the Insurers have the right to rescind—the Court comes to the same result. ACC and ABIZ have legitimate concerns as to possible prejudice to them under principles of collateral estoppel or *stare decisis.* As ACC and ABIZ are not defendants in the Declaratory Judgment Action (and, absent leave of this Court, will not be defendants in the Declaratory Judgment Action at least in the near future), this Court has some doubts as to whether collateral estoppel would apply; if the issue came up on this Court's watch, it would likely regard the absence of ABIZ and ACC in the action giving rise to the argued collateral estoppel to be fatal to such a contention. But the issue is not likely to come up on this Court's watch; it may well come up before another court, and it would be presumptuous for this Court to suggest how any other court should rule on an issue

before it. The courts in this and other districts have repeatedly recognized that section 105 may be used to enjoin litigation against non-debtors where there is the potential threat of the debtor being collaterally estopped from asserting defenses if an adverse judgment is entered against the non-debtors.[30] It is sufficient for the Court to find,[31] and the Court does find, that there is a risk of imposition of collateral estoppel.

There is a considerably greater risk, however—not so much of collateral estoppel, but rather of adverse precedent. If the Declaratory Judgment Action is not stayed (or at least those aspects relating to rescission are not stayed), the court hearing the Declaratory Judgment Action could come to legal or factual conclusions in the context of efforts to rescind the D & O Policies as against the Rigases or others. Assuming that collateral estoppel is not imposed, there is nevertheless a considerable risk to ABIZ and ACC if the Declaratory Judgment Action proceeds by reason of the close similarity in facts and issues that will exist at the time rescission as to ABIZ and ACC is thereafter considered. Counsel for ABIZ was quite correct when she noted at oral argument[32] that most courts are loath to come to a completely different decision about an identical policy involving an identically situated party; there is a considerable *stare decisis* risk,

---

**30.** *See, e.g., In re United Health Care Org.,* 210 B.R. 228, 232 (S.D.N.Y.1997); *Eastern Airlines v. Rolleston (In re Ionosphere Clubs, Inc.),* 111 B.R. 423, 435 (Bankr.S.D.N.Y. 1990); *Lomas Financial Corp. v. Northern Trust Co. (In re Lomas Financial Corp.),* 117 B.R. 64, 67 (S.D.N.Y.1990); *American Film Technologies, Inc. v. Taritero (In re American Film Technologies, Inc.),* 175 B.R. 847, 849–850 (Bankr.D.Del.1994).

**31.** *See American Film Technologies,* 175 B.R. at 850 (a finding of liability against the directors would expose the debtor to "the *risk*

of being collaterally estopped from denying liability for its directors' actions") (emphasis added); *Lomas Financial Corp.,* 117 B.R. at 67 (stay upheld because it was "not possible for the debtor ... to be a bystander to a suit which may have a $20 million issue preclusion effect against it") *quoting In the Matter of Lomas,* Adversary Proceeding No. 89–6602A, Slip Op. at 11 (Bankr.S.D.N.Y. January 11, 1990).

**32.** Arg. Tr. at 14.

apart from any collateral estoppel risk. And counsel for ABIZ was likewise quite correct when she noted at oral argument [33] that counsel in the shoes of ACC or ABIZ would be in a difficult dilemma if the D & O Policy Action were to proceed on rescission issues in the absence of ACC and ABIZ:

> And whether ABIZ is going to sit on the sidelines and roll the dice and find out where stare decisis or collateral estoppel applies is a dangerous move when you have $50 million of insurance coverage at risk to the estate.[34]

ACC and ABIZ are thus presented with two unattractive alternatives: to "roll the dice," on the one hand, or to enter the fray, at considerable expense, on the other—notwithstanding a statutory scheme, implemented most clearly in section 362 itself, that debtors are to be protected from the need to do the latter. All of that presents a material threat to successful reorganization for each of ACC and ABIZ. The Court considers it necessary and appropriate to protect ACC and ABIZ from those risks.

### 2. Deposition Discovery

■ Additionally, for related reasons, the Court believes that it must stay deposition discovery in the Declaratory Judgment Action. If, as might otherwise be the case, the Rigases were called upon to testify and then took the Fifth Amendment, there is a risk that adverse consequences might attach not only to the Rigases, but also to ACC and ABIZ. For example, if the Rigases were to refuse to answer questions about allegedly wrongful conduct, or their knowledge of such, when the D & O Policies were put in place, the

Insurers might argue in a subsequent proceeding with ACC or ABIZ that a negative inference should be drawn from such assertion of the privilege.

The risk of such is also a threat to a successful reorganization on the part of ACC and ABIZ. The Court considers it necessary and appropriate to protect ACC and ABIZ from those risks as well.

### 3. Other Litigated Matters

■ A third area of controversy raises different concerns. The Rigases wish to move, in the Declaratory Judgment Action, for an order declaring, as a matter of Pennsylvania insurance law, that the Insurers must advance defense costs to the Rigases until and unless the Rigases have been found guilty of wrongdoing. The Rigases contend that this could be done by the briefing and argument of legal issues only, and would not require testimony on their part or on the part of anyone else. They also contend, presumably, that this could be done without deciding any matters relating to rescission of the policies, which, as noted above, this Court will stay.[35] They add, in this connection, that they are willing, for the time being, to be bound to the $300,000 per insured limitation this Court imposed before its Initial Decision was vacated.

The latter concession is important to this Court. Without it, unlimited drains on policy proceeds would have the effect of destroying the policies themselves—an injury of the type that the District Court ruled that the automatic stay can protect. And as this Court found in the Initial Decision, and again above, ABIZ needs the

---

**33.** *Id.* at 15.

**34.** *Id.* (transcription errors corrected).

**35.** If this premise is not correct, this Court's restrictions on any litigation involving rescission of the D & O Policies will necessarily mean that issues in this latter area cannot now be litigated either.

D & O Policies, as it cannot secure re-placements for them; this Court has found that ABIZ needs the D & O Policies for its reorganization. If this Court were ever to fear that the proceeds in their entirety were at risk of dissipation, and hence that there was the risk of the destruction of the policies, it would regard it as appropriate to stay anything that could lead to such an unfortunate result, including litigation of the type the Rigases wish now to bring, seeking an entitlement to an advance of policy proceeds.[36]

But with the Rigases having undertaken to limit their requests to $300,000 per in-

sured, they have eliminated the threat to the policies themselves.[37] Their desire now is to reach only policy proceeds, which the District Court has held are not proper-ty of the estate. This Court does not believe that in the absence of a resulting threat to reorganization, it can protect pol-icy proceeds consistent with the holding of the District Court, and a drain on policy proceeds to that limited extent does not threaten either Debtor's reorganization.

Although the District Court Decision raises questions that the bankruptcy com-munity will likely wish to consider when this issue next arises,[38] the decision of the

---

**36.** That would be true even if, as the Rigases say they are willing to do, the Rigases paid back any sums advanced to them by the In-surers if it later turned out the Rigases had acted wrongfully. If a determination is made anywhere that the Rigases acted wrongfully, the Rigases will likely be saddled, perhaps even by principles of collateral estoppel, with liabilities going into the billions of dollars, and anyone seeking repayment of sums ad-vanced from them—*e.g.* the Insurers and/or the Debtors—would have to compete with dozens of other claimants, asserting huge competing claims.

**37.** The Court notes that this undertaking is a critical one, upon which this Court has placed substantial reliance, and this Court would be most reluctant to increase the $300,000 cap to any level that raises a material risk of depletion of the policy proceeds to an extent that the value of the policies themselves is jeopardized.

**38.** Courts considering this issue hereafter may wish to consider whether the District Court's conclusion that ACC did not have a property interest in the proceeds of the insur-ance policies "yet" is consistent with caselaw that the District Court did not address, and the text of section 541 of the Bankruptcy Code. A fair number of decisions of the Unit-ed States Supreme Court and the Second Circuit hold that "property" of the estate—now defined in section 541 as "all legal or equitable interests of the debtor in property as of the commencement of the case"—is broad-ly defined; does not depend on whether en-joyment of the property is contingent or must

be postponed; and is determined as of the commencement of the case and does not de-pend on post-petition events. See *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–205, 103 S.Ct. 2309, 76 L.Ed.2d 515 (the "House and Senate Reports on the Bankrupt-cy Code indicate that § 541(a)(1)'s scope is broad"); *Official Comm. of Unsecured Credi-tors v. PSS S.S. Co. (In re Prudential Lines Inc.),* 928 F.2d 565, 573 (Congress wished to " 'bring anything of value that the debtors have into the estate' ") *quoting* H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 176, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6136; *Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 ("[T]he term 'prop-erty' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed."); *id.* at 380, 86 S.Ct. at 515 ("postponed enjoyment does not disquali-fy an interest as 'property' "); *Mid–Island Hosp., Inc. v. Empire Blue Cross and Blue Shield (In re Mid–Island Hosp., Inc.),* 276 F.3d 123, 128 (2d Cir.), *cert. denied,* 537 U.S. 882, 123 S.Ct. 104, 154 L.Ed.2d 140 (2002) ("This definition of property of the estate under sec-tion 541 is broad and includes even strictly contingent interests."). And one commenta-tor has stated with respect to the District Court Decision:

> Given the pre-petition nature of the policy and the rights derived from it, it is difficult to determine why the court concluded that the debtor did not have any rights under the policy "yet" because it had not made any payments for which it would be entitled to

District Court, under fundamental principles, is now binding on this Court in the ACC and ABIZ cases.[39] This Court's duty to comply with the mandate of an appellate court, on the remand of a case before it, applies to issues that have been decided either expressly or by necessary implication.[40] In order to remain true to those principles, this Court believes that it must act consistently with not just the outcome of the District Court Decision, but also any reasoning underlying it, stated expressly or by necessary implication. That includes the District Court's determination that policy proceeds are not yet property of the estate.

Accordingly, since the Rigases now seek access to no more than $300,000 per insured in policy proceeds (which will not

reimbursement at the time the directors sought to draw on the proceeds. It suggests that whether or not policy proceeds qualify as estate property hinges on post-petition events, an idea which contradicts traditional analysis.

Douglas, "D & O Policy Proceeds Not Estate Property," 2 *Business Restructuring Review* 4, 8 (Oct.2003) The theory that the proceeds might not be estate property yet was not argued before the Bankruptcy Court, and thus this Court had no occasion to bring these cases to the attention of the District Court. Also, it may be that the cases discussing whether policy proceeds are property of the estate are not as inconsistent as the District Court characterized them, when one also considers the extent to which each of those cases, on its facts, involved indemnification or, particularly, entity coverage. *Louisiana World Exposition*, a 1987 Fifth Circuit decision and the only one at the Court of Appeals level upon which the District Court Decision relied, was expressly distinguished by the Fifth Circuit in its later 1995 decision in *Vitek* by reason of the presence of entity coverage. *See* 51 F.3d at 535 ("On one extreme, when a debtor corporation owns a liability policy that *exclusively* covers its directors and officers, we know from *Louisiana World Exposition* that the proceeds of that D & O policy are *not* part of the debtor's bankruptcy estate. On the other extreme, when a debtor corporation owns an insurance policy that covers its own liability *vis-a-vis* third parties, we—like almost all other courts that have considered the issue—declare or at least imply that both the policy *and the proceeds* of that policy are property of the debtor's bankruptcy estate") (emphasis in original; footnotes deleted). *Sacred Heart Hospital* distinguished *Louisiana World Exposition* for the same reason. *See* 182 B.R. at 419–420 ("The *LWE* case is quite easily distinguished from the case at bar. ... More important, however, is the fact that the

Debtor's own liability exposure is also covered by the D & O Policy.")

Other cases upon which the District Court Decision relied either did not focus on the policy-proceeds distinction, or lacked entity coverage. *See Zenith Laboratories, Inc. v. Sinay (In re Zenith Laboratories, Inc.)*, 104 B.R. 659, 665–666 (D.N.J.1989) (an early case, pre-dating *Vitek*, which did not focus on the policy-proceeds distinction, and which indeed held that the *policy itself* was not property of the estate—a view rejected in the District Court Decision and in substantially all of the cases); *In re Daisy Systems Securities Litigation*, 132 B.R. 752, 755 (no entity coverage, and possibility of indemnification payments that would entitle estate to reimbursement was remote); *In re CHS Electronics, Inc.*, 261 B.R. 538, 543 (Mark, J.) (noting "there is *in actuality* no Entity Coverage issue here," and holding automatic stay *did* apply by reason of indemnification coverage—"To the limited extent that the Proceeds necessary to satisfy the Debtor's indemnification claims could be considered property of the estate, the automatic stay would apply"—but then granting relief from stay); *accord id.* at 544; *In re Youngstown Osteopathic Hospital Ass'n*, 271 B.R. 544, 550 (Bankr.N.D.Ohio 2002) (Bodoh, J.) ("There is no entity coverage"); *id.* at 551 ("This Court makes no legal conclusions regarding entity coverage, other than to find that [debtor] YOH had none and that the existence of entity coverage could change this Court's analysis").

**39.** *See, e.g., In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S.Ct. 291, 40 L.Ed. 414 (1895); *United States v. Fernandez*, 506 F.2d 1200, 1202–1203 (2d Cir.1974).

**40.** *See, e.g., Doe v. New York City Dept. of Social Services*, 709 F.2d 782, 788 (2d Cir. 1983); *Riley v. MEBA Pension Trust*, 586 F.2d 968, 970 (2d Cir.1978).

destroy the policies themselves), and they will not be permitted to litigate rescission issues, this Court is not in a position to stay the Declaratory Judgment action insofar as the Rigases seek an order in that action requiring the Insurers to advance policy proceeds before the propriety of their conduct has been determined.[41]

### 4. Reconsideration

This Court's determination in the Initial Decision was subject to reconsideration at the conclusion of the criminal trial. The reasons for which it was so are no less applicable now, and the rulings in this decision will similarly be subject to reconsideration at that time. The rulings here are likewise subject to reconsideration in the event of any modification of the mandate, by the District Court or any higher court.

### Conclusion

For the foregoing reasons, the Court:

(1) Stays proceedings in the Declaratory Judgment Action insofar as they relate, in any way, to requests for rescission of the D & O Policies, including, without limitation, any motions to dismiss rescission claims;

(2) Stays deposition discovery in the Declaratory Judgment Action;

(3) Denies a stay of the Declaratory Judgment Action otherwise.

Each of the foregoing is subject to modification and/or reconsideration at the conclusion of the criminal trials involving John, Timothy and Michael Rigas, or in the event of a modification of the mandate by the district or any higher court.

ACC and ABIZ are to submit an order in accordance with this decision at their earliest reasonable convenience.

---

**41.** The Insurers note that letting the Rigases litigate an asserted duty on the part of the Insurers to advance defense costs without letting them likewise litigate issues relating to rescission, or to policy defenses based on the Rigases' conduct (which likely would require the now-stayed testimony of the Rigases and others, including witnesses whom the United States Government wishes not to be deposed until the end of the criminal trial), is grossly unfair. This Court respects these concerns, but it has duties to comply with a mandate of a higher court, and to issue injunctions under the Bankruptcy Code only to advance bank-

ruptcy policy. This Court's order is of course without prejudice to the Insurers' right to raise the matter of the fairness of what the Rigases propose with the court in the Declaratory Judgment Action. That court will be as capable of addressing these concerns as this Court. This Court believes that it should minimize the extent to which it issues rulings within the domain of the court in the Declaratory Judgment Action, and that this Court's stay should be to the minimum extent necessary to implement its bankruptcy needs and concerns.