ASSOCIATED ELECTRIC & GAS
INSURANCE SERVICES,
LTD., et al

v.

John J. RIGAS, et al.

No. Civ.A. 02–7444.

United States District Court,
E.D. Pennsylvania.

March 17, 2004.

Dan A. Bailey, Michael R. Goodstein, Bailey Cavalieri LLC, Columbus, OH, Robyn Farrell McGrath, Sweeney & Sheehan, P.C., David Newmann, Hogan & Hartson L.L.P., Philadelphia, PA, Edward C. Crooke, Peter R. Bisio, Hogan & Hartson LLP, Gabriela Richeimer, John R. Gerstein, Ross, Dixon & Bell LLP, Leslie S. Ahari, Ross, Dixon and Masback, Washington, DC, Michael N. Onufrak, White & Williams LLP, Philadelphia, PA, for Plaintiffs.

Bradford McIlvain, John J. Higson, Dilworth Paxson LLP, Philadelphia, PA, R. Mark Keenan, Alex D. Hardiman, Anderson, Kill & Olick P.C., New York City, Timothy P. Law, Anderson, Kill & Olick PC, Jeremy Heep, Pepper Hamilton LLP, Philadelphia, PA, for Defendants.

## MEMORANDUM

BAYLSON, District Judge.

The issue presented is whether the insurance carriers which issued directors' and officers' policies to Adelphia Communications Corporation ("Adelphia") must advance defense costs to five of its former officers and directors. Presently before the Court are a Motion for Partial Summary Judgment to Require Advancement of Defense Costs by Defendants John J. Rigas, Michael J. Rigas, Timothy J. Rigas and James P. Rigas ("the Rigases") and a motion for the same relief by Defendant Peter L. Venetis ("Venetis") (collectively, "Insureds"). Adelphia, and a related corporation, Adelphia Business Solutions, Inc. ("ABIZ"), are debtors under the jurisdiction of the bankruptcy court (Judge Gerber in the Southern District of New York). Although Judge Gerber originally issued a stay of all proceedings applicable to this case, he recently lifted that stay for the limited purpose of this Court deciding whether, under the terms of the insurance policies, and before adjudication of the merits of the Carriers' claims of denial of coverage, the Carriers must pay $300,000 for the civil defense costs incurred by each of the Rigases and Venetis. For the reasons stated below, the Carriers will be ordered to make these payments.

## I. Background

The Rigases and Venetis are each former officers and/or directors of Adelphia

and ABIZ. In their capacities as former officers and directors of Adelphia and ABIZ, the Rigases have been sued in numerous class actions suits, derivative actions, and individual securities actions. John, Michael, and Timothy Rigas are defendants in a criminal action now pending in the Southern District of New York. Although James Rigas and Venetis are named in a number of these civil suits, they have not been charged with any crime.

As officers and/or directors, the Rigases and Venetis are insured by three directors' and officers' liability polices ("D & O Policies") issued by Plaintiffs Associated Electric & Gas Insurance Services Limited ("AEGIS"), Federal Insurance Company of the Chubb Group of Insurance Companies ("Federal") and Greenwich Insurance Company ("Greenwich") (collectively, "Carriers"). The AEGIS policy is the primary policy and the Federal and Greenwich polices provide supplemental coverage.[1] The Rigases and Venetis have sought payment of defense costs pursuant to the insurance policies relating to the various civil suits brought against them. The Carriers have refused to advance defense costs and have attempted to rescind the policies as to the Rigases and Venetis.

On September 24, 2002, the Carriers filed this declaratory judgment action. Before filing suit, the Carriers notified the Rigases, Venetis, and other directors and/or officers that the Carriers rescinded their respective directors' and officers' liability insurance policies because the policies were procured by fraud. The Carriers also advised these insureds that, even absent rescission, there would be no coverage for the lawsuits filed in the wake of Adelphia's revelation that its financial statements were false and misleading based on several exclusions to coverage contained in the policies. The Carriers filed this declaratory judgment action to obtain judicial confirmation of their positions.

This case was stayed by the November 15, 2002 decision of the bankruptcy court overseeing the Adelphia and ABIZ bankruptcy proceedings, pursuant to 11 U.S.C. § 362, until the conclusion of the criminal cases against the Rigases. *In re Adelphia Communications Corp.*, 285 B.R. 580 (Bkrtcy.S.D.N.Y.2002). The bankruptcy court ruled that although the Rigases and Venetis could each request up to $300,000 in civil defense costs from the Carriers, the Carriers could refuse to advance any defense costs that they determined not to be covered under the policy. The bank-

---

**1.** The Carriers also argue that Federal and Greenwich should not be implicated in this proceeding, as the policies they issued do not take effect until the AEGIS policy is exhausted. The AEGIS policy includes $25 million in coverage, and the bankruptcy court has only allowed the Rigases and Venetis to seek $300,000 each in defense costs at this stage in the proceedings. The Rigases and Venetis argue that the bankruptcy court left open the option for them to seek additional coverage of defense costs in the future and, thus, it is appropriate to include Federal and Greenwich in the motions currently before this Court.

Given the bankruptcy court's ruling that Rigases and Venetis can seek additional fund-

ing for defense costs at a future point, Greenwich and Federal are potentially implicated in this Court's decision on the pending motions. Under Pennsylvania law, a party can seek a ruling on defense costs even if the amount of liability is not yet ascertainable. *General Accident Ins. Co. of America v. Allen*, 547 Pa. 693, 692 A.2d 1089, 1095 (1997). In addition, the Greenwich and Federal polices include the same relevant terms regarding coverage as the AEGIS policy. Thus, although it is appropriate for Federal and Greenwich to be subject to the motions currently before this Court, the Court finds it unnecessary to rule on the motions as to Federal and Greenwich at this time. *See* discussion *infra* Part V.

ruptcy court ruled that it would not grant relief from its stay to litigate the declaratory judgment action before this Court because the debtors in the bankruptcy action had a property interest in the proceeds of the D & O Policies, and the $300,000 requested was "proceeds."

On appeal, Judge Baer of the district court vacated and remanded the matter. *In re Adelphia Communications Corp.*, 298 B.R. 49 (S.D.N.Y.2003). The district court held that the bankruptcy court's application of an automatic stay under 11 U.S.C. § 362(d)(1) was in error because the debtors do not have a property interest in the D & O Policy proceeds, and remanded the case to the bankruptcy court to determine whether it should stay the request for advancing the $300,000 under its discretionary powers in 11 U.S.C. § 105(a).

On remand, the bankruptcy court concluded it would modify the stay so as to permit litigation in this Court of the limited issue of whether the Carriers were required as a matter of law to make the immediate payment of the $300,000 in civil defense costs incurred and requested by the Rigases and Venetis. *In re Adelphia Communications Corp.*, 302 B.R. 439 (Bkrtcy.S.D.N.Y.2003) The bankruptcy court found, in an exercise of its discretionary power, that continuing the stay of this action was appropriate in so far as it relates to the Carriers' request for rescission, any factual findings, and all deposition discovery.[2] However, the bankruptcy court allowed the Insureds to pursue their claim for $300,000 worth of advancement of defense costs in this Court.

> Accordingly, since the Rigases now seek access to no more than $300,000 per insured in policy proceeds (which will not destroy the policies themselves), and they will not be permitted to litigate rescission issues, this Court is not in a position to stay the Declaratory Judgment action insofar as the Rigases seek an order in that action requiring the Insurers to advance policy proceeds before the propriety of their conduct has been determined.

*Id.* at 454–455.

Accordingly, the Rigases and Venetis are now seeking partial summary judgment to resolve this issue. Defendants each filed a motion for partial summary judgment on January 5, 2004 and briefing was completed on February 13, 2004. Oral argument was held on March 4, 2004.[3]

---

**2.** The bankruptcy court's decision, however, provides that the stay of this litigation can be reconsidered at the conclusion of the Rigases' criminal trial. 302 B.R. at 443. The Carriers have raised the argument that the motions currently before this Court should be held under advisement as to John, Michael and Timothy Rigas, pending the conclusion of the criminal trial, which is currently underway and is expected to take several months. As the issue currently before this Court is one of advancement of costs, which by definition provides for coverage while litigation is ongoing, this Court will decline to hold these motions as to John, Michael and Timothy Rigas under advisement pending the completion of the criminal trial. Assuming the conclusion of the trial results in a verdict, if the verdict is guilty, remaining issues may include whether such a verdict itself determines any coverage issue, whether a judgment of sentence is required, or whether all appeals must be exhausted before the coverage issue can be decided.

**3.** At oral argument, the Court raised the issue of why this dispute was not being mediated or arbitrated, pursuant to Section IV(Q) of the AEGIS policy. Since counsel for all parties stated at oral argument that they agree that this suit is the best way to resolve their dispute, the parties have apparently agreed to ignore the policy's arbitration provision. Although the Court makes no finding as to this matter, the Court does note that, as neither party has attempted to enforce the policy's arbitration provision, the doctrine of waiver would likely be implicated here, should one of

This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims occurred in this district.

## II. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

As noted above, the bankruptcy court's stay of this proceeding precludes this Court from making any factual findings. There is no factual dispute as to the contents of the policies in question. Thus, resolution of these motions is limited to questions of law. The Court must determine whether it can decide the issue of advancement of $300,000 to each of the five movants as a legal issue, without deciding any underlying facts. *Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C.*, 821 F.2d 216, 219 (3d Cir.1987) (finding that where the underlying facts are not in dispute, determination of proper coverage under an insurance contract is a matter of law). Both parties agree Pennsylvania law covers this dispute.

## III. Discussion

The only issue here is whether, before adjudication of the merits of the Carriers' claim of lack of coverage based on exclusions in the policies or rescission of the policies, the Carriers must pay $300,000 each for defense costs incurred by the Rigases and Venetis.

### A. Contentions of the Parties

The Rigases and Venetis argue that the language of the policies requires immediate payment of defense costs and, in the alternative, the language of the policies is ambiguous, and Pennsylvania law requires that the policy be construed for the benefit of the insureds. The Rigases and Venetis also argue that the Carriers' contentions regarding the fraud exclusion and rescission both require an adjudication and that, until this adjudication occurs, defense costs

the parties attempt to enforce arbitration. *See Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912 (3d Cir.1992) (finding that where a party delays in asserting a right to arbitrate, thereby causing prejudice to the other party, waiver of the right to arbitrate should be found); *St. Paul Mercury Ins. Co. v. Perry*, 227 F.Supp.2d 430, 436 (E.D.Pa., 2002) (finding the right to arbitrate is waived where defendants did not assert the right to arbitrate until the summary judgment stage of litigation). Although, where one party is attempting to compel arbitration, courts (including the Supreme Court, *see, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)) have frequently compelled parties to submit a dispute to arbitration under the Federal Arbitration Act, 9 U.S.C. § 2 (2003), courts have not compelled arbitration where, as here, both parties have agreed to litigate in lieu of arbitration. Thus, this Court finds that it is proper to consider the motions before it, despite Section IV(Q) of the AEGIS policy.

must be paid by the Carriers. Finally, the Rigases and Venetis maintain that the view espoused by the Carriers would result in an unconscionable contract, as it would create a contract for an insurance policy that would give the Insureds no choice.

The Carriers maintain that they have rescinded the policy, an action they can take unilaterally without a judicial determination. The Carriers alternatively argue that summary judgment is not appropriate for the disposition of a limited, non-dispositive issue such as the payment of defense costs at this time.[4] The Carriers further argue that the policies themselves do not require advance payment of uncovered defense costs and that there is no ambiguity in the policy as to this point. In addition, one of the exclusions on which the Carriers rely, the Prior Knowledge Exclusion, does not require an independent judicial adjudication.

## B. Rescission

■ The Carriers first assert that they are refusing payment based on rescission of the policy, and that, under Pennsylvania law, they can unilaterally rescind a policy without a judicial determination. The Insureds contend that there is no unilateral right to rescind without a judicial determination and that such a view would result in an unconscionable contract. The AEGIS

policy itself does not contain any provisions regarding rescission, although it does provide for cancellation of the policy under Section IV(M).

The Court finds that a determination on the issue of recession is prohibited by the stay still in effect. Judge Gerber held [T]he Court:

(1)Stays proceedings in the Declaratory Judgment Action insofar as they relate, in any way, to requests for rescission of the D & O Policies (and thus the Court stays motions by the Rigases to dismiss Insurers' rescission claims)—as doing so is necessary and appropriate to aid in the reorganization of the Debtors ACC and ABIZ, and to protect the property interests of the Debtors ACC and ABIZ in the policies, even if their proceeds are not protected by the automatic stay;

*In re Adelphia Communications. Corp.,* 302 B.R. 439, 443 (Bkrtcy.S.D.N.Y.2003)

■ Even if this Court were to consider the issue, the record would not allow for a finding of rescission. Pennsylvania law provides that an insurance policy is void *ab initio* for misrepresentation when the insurer can establish that the insured knowingly or in bad faith made a false representation and that the misrepresentation was material to the risk being insured. *Matinchek v. John Alden Life Ins. Co.,* 93 F.3d 96 (3d Cir.1996). Rescission is also

---

4. The Carriers also argue that, rather than motions for summary judgment, the motions filed by the Rigases and Venetis are tantamount to motions for a preliminary injunction and are, thus, subject to the higher standard required of such motions. The Carriers' argument does not comport with the posture of this case. The Insureds have not moved for a preliminary injunction, rather, they have moved for partial summary judgment. The record reflects an agreement by the parties, after the issuance of the bankruptcy court's decision, that this declaratory judgment action would be the vehicle to resolve the dispute about the advancement of the $300,000 for each movant, as a question of law. Summary judgment motions in declaratory judgment actions are uniformly employed in federal courts to determine policy coverage issues. *See, e.g., Westport Ins. Corp. v. Mirsky,* 84 Fed.Appx. 199 (3d Cir.2003) (considering declaratory judgment action to determine policy coverage). In addition, an application for a preliminary injunction would be impossible to consider, as it would necessarily require the presentation of evidence and factual findings by this Court, which would be contrary to the bankruptcy court's stay.

available when the insurer can show clear and convincing evidence that the insured knowingly failed to disclose information which was material to the risk to be insured. *Rohm & Haas Co. v. Continental Casualty Co.*, 732 A.2d 1236, 1251 (Pa.Super.1999). The Carriers contend, and the black letter law of Pennsylvania supports the view, that rescission is available to a defrauded party without a judicial determination if the party repudiates the contract and provides restitution. In the insurance context, restitution would be the return of the insurance premium. *See Wolgin v. Smith*, 1996 WL 355338, 1996 U.S. Dist. LEXIS 8563 (E.D.Pa.1996) (discussing the election of remedies, and finding that a defrauded party can either affirm a contract and sue for damages or rescind the contract by repudiating and providing restitution); Lee Russ & Thomas Segalia, *Couch on Insurance* § 32:63 (3d ed.2003) (stating that relinquishment of consideration is essential to rescission by insurer).

There was extensive discussion at oral argument concerning whether the Carriers should have returned the premium at the time they purportedly exercised their unilateral right of recession. *See* Transcript of March 4, 2004 Oral Argument at 16–20 (hereinafter "Tr. at __"). The Carriers may find themselves facing a conundrum on this issue because of the pending bankruptcy of Adelphia and ABIZ. This Court makes no finding as to the validity of rescission, but it does note that the Carriers have not returned the insurance premium. According to the Carriers, the stay prevents them from returning the policy premiums. It is likely, even if the Carriers were to return the policy premiums, that additional litigation would result as to the validity of the rescission. Thus, this Court is presented with a situation where unilateral rescission by the Carriers has not been completed and a judicial finding of rescission is currently precluded by the pending bankruptcy proceedings.

■ A number of cases support the Insureds' contention that defense costs must be advanced pending the outcome of a rescission claim. A recent decision in *Federal Insurance Co. v. Tyco International Ltd.*, Index No. 600507/03 (N.Y.Sup.Ct. March 5, 2004), a case where the insurer refused to pay defense costs pending the outcome of a rescission claim, held "until Federal's rescission claims are litigated in its favor and the Policies are declared void *ab initio*, they remain in effect and bind the parties." *Id.* at 8. The court went on to say that the insurer's distinction between the unilateral rescission it was claiming (the insurer had returned the insurance premium) and adjudicated rescission did not affect the outcome, "However, that difference is irrelevant: the cited cases and this action are materially alike in that all the insureds have challenged whether the insurers validly can rescind their policies, and have sought an adjudication finding the policies valid and binding and directing the insurers to perform under them." *Id.* at 9.

The Insureds also cite a number of cases outside this jurisdiction for the proposition that defense costs must be advanced pending the outcome of a rescission claim.[5] All of these cases reflect a consistent position that, because a contract is in effect until the issue of rescission is adjudicated, an insurer is bound by the obligations in that contract to advance defense costs until the contract is found to be rescinded.

In *National Union Fire Ins. Co. v. Brown*, 787 F.Supp. 1424 (S.D.Fla.1991)

---

**5.** Several of these cases apply Florida law, which, although it has statutory provisions regarding insurance contracts which Pennsyl-

vania law does not, does not affect the application of these cases to the situation before this Court.

*aff'd, National Union Fire Ins. v. Brown,* 963 F.2d 385 (11th Cir.1992), a case where the insurer was claiming both exclusions from the policy based on fraud and rescission, the district court found that, until the rescission claim was fully litigated, the policy remained in effect and the insurer must pay the insured's defense costs until the issue of fraud was resolved because the insurance contract in that case provided that the exclusion for fraud did not take effect until a final adjudication of the issue. In addition, the court relied on the Third Circuit decision in *Little* for the proposition that the insurer's duty to pay defense costs occurs when the insured is "legally obligated to pay" those costs.

In *Pacific Ins. Co. v. General Development Corp.,* 1992 U.S. Dist. LEXIS 22057 (S.D.Fla.1992), the court found that, as in a related case where coverage exclusions were at issue, an insurer claiming rescission must advance defense costs because the contract is effective until the rescission issue is resolved. On appeal of this decision, in *Pacific Ins. Co. v. General Development Corp.,* 28 F.3d 1093 (11th Cir. 1994), the court simply found that the appeal of the district court's order requiring advancement of defense costs was moot because there had been a determination of fraud by the insured and thus the insurer's claims based on both exclusions and rescission had been adjudicated.

The Insureds also cite *National Union Fire Ins. Co. v. Sahlen,* 999 F.2d 1532 (11th Cir.1993), which does not directly address the issue of advancement of costs, as it simply affirmed a district court decision finding an insurance contract rescinded under Florida statutory law and, thus, that no defense payments were due, in a case where advance payments were originally required pending the outcome of the rescission action.

These cases are consistent with the approach of Pennsylvania law to apply insurance policies broadly, and in favor of the insured where there is ambiguity. In addition, the cases cited by the Carriers do not support their position that defense costs need not be advanced pending the litigation of the rescission claim. *Bogatin v. Federal Insurance Co.,* 2000 WL 804433 (E.D.Pa., June 21, 2000), where a court addressed the merits of a rescission claim before addressing the payment of defense costs, supports the proposition that allowing an insurer to refuse payment of defense costs pending a rescission attempt runs contrary to Pennsylvania law. The other case cited by the Carriers, *Anglo-American Ins. Co. v. Molin,* 547 Pa. 504, 691 A.2d 929 (1997), is not on point. *Molin* is a case where the insureds, defendants in a declaratory judgment action similar to the one before this Court, moved for a preliminary injunction to require payment of defense costs and the court, applying the higher standard for a preliminary injunction, found that the insureds failed to show that they would likely succeed at trial in proving that the coverage exclusions did not apply. The Court, thus, refused to issue a preliminary injunction. There is no such motion before this Court.

Thus, as this Court cannot find that rescission of the AEGIS policy has taken place as a matter of law, the Carriers' argument that the policy is void *ab initio* fails. The Court must then turn to the language of the policy to determine whether the Carriers are obligated to advance defense costs.

## C. The Relevant Provisions of the Insureds' AEGIS Policy

Because resolution of this issue will depend, in part, on the interpretation of the language of the policy, the Court will first delineate the relevant language of the AEGIS policy before examining the parties' contentions regarding advancement of de-

fense costs and exclusions from coverage under the policy. Section I(A)(1) of the AEGIS policy provides:

I. INSURING AGREEMENT

(A) Indemnity

(1) The INSURER shall pay on behalf of the DIRECTORS and OFFICERS any and all sums which they shall become legally obligated to pay as ULTIMATE NET LOSS for which the COMPANY has not provided reimbursement, by reason of any WRONGFUL ACT. . . .

Section II(O) defines "Ultimate Net Loss":

II. DEFINITIONS

.    .    .    .    .

(O) ULTIMATE NET LOSS: The term "ULTIMATE NET LOSS" shall mean the total INDEMNITY and DEFENSE COST with respect to each WRONGFUL ACT to which this POLICY applies, provided that ULTIMATE NET LOSS does not include any amount allocated, pursuant to Condition (T), to CLAIMS against persons or entities other than DIRECTORS and OFFICERS or to non-covered matters.

Section IV(T), as amended by Endorsement 20A, referred to as "Condition T" provides:

(T) Allocation

If a CLAIM is made against both the DIRECTORS and OFFICERS and others, including the COMPANY, or if a CLAIM against the DIRECTORS and OFFICERS includes both covered and non-covered matters, the DIRECTORS and OFFICERS and the COMPANY and the INSURER shall allocate on a fair and reasonable basis any defense costs, settlement, judgement or other loss on account of such CLAIM between covered ULTIMATE NET LOSS attributable to the CLAIM against the DI-

RECTORS and OFFICERS and non-covered loss.

If the DIRECTORS and OFFICERS, COMPANY and the INSURER agree on an allocation of DEFENSE COSTS, the INSURER shall advance on a current basis DEFENSE COSTS allocated to the covered ULTIMATE NET LOSS. If the DIRECTORS and OFFICERS, COMPANY, and the INSURER cannot agree on an allocation:

(1) no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

(2) the INSURER shall advance on a current basis DEFENSE COSTS which the INSURER believes to be covered under this POLICY until a different allocation is negotiated, mediated or arbitrated; and

(3) any disagreement on the allocation of DEFENSE COSTS is to be settled in accordance with Condition (Q).[6]

Any negotiated, mediated or arbitrated allocation of DEFENSE COSTS on account of a CLAIM shall be applied retroactively to all DEFENSE COSTS on account of such CLAIM, notwithstanding any prior advancement to the contrary. Any allocation or advancement of DEFENSE COSTS on account of a CLAIM shall not apply to or create any presumption with respect to the allocation of INDEMNITY on account of such CLAIM. Advancement by the INSURER of DEFENSE COSTS shall be conditioned upon the DIRECTORS, OFFICERS or COMPANY, as applicable, providing a satisfactory written undertaking to repay the INSURER any DEFENSE COSTS finally established not to be insured.

---

6. Condition Q, laid out in Section IV(Q) of the policy, entitled "Dispute Resolution and Ser- vice of Suit," provides for negotiation and/or arbitration. *See* discussion *supra* note 3.

Section III provides for several exclusions from coverage, only two of which are relevant here. The first is in Section III(A)(4), which the Court will refer to as the "Prior Knowledge Exclusion," which excludes claims as to which a director or officer had prior knowledge:

III. EXCLUSIONS

The INSURER shall not be liable to make any payment for ULTIMATE NET LOSS arising from any CLAIM(S) made against any DIRECTOR or OFFICER:

(A) ... (4) where, at the inception of the POLICY PERIOD, such DIRECTOR or OFFICER had knowledge of a fact or circumstance which was likely to give rise to such CLAIM(S) and which such DIRECTOR or OFFICER failed to disclose or misrepresented in the Application or in the process of preparation of the Application, other than in a Renewal Application; provided, however that this exclusion shall not apply to such CLAIM(S) made against any DIRECTOR or OFFICER other than such DIRECTOR or OFFICER who failed to disclose or misrepresented such fact or circumstance; provided further that this exclusion shall not limit the INSURER'S right to exercise any remedy available to it with respect to such failure to disclose or misrepresentation other than the remedy provided for in this Exclusion.

The second relevant exclusion is Section III(B), as amended by Endorsement 1A, which the Court will refer to as the "Fraud Exclusion," and which excludes claims that arise from the fraud or criminal activity of an officer or director:

III. EXCLUSIONS

The INSURER shall not be liable to make any payment for ULTIMATE NET LOSS arising from any CLAIM(S) made against any DIRECTOR or OFFICER:

(B) with respect to Insuring Agreement I(A)(1) only:

(1) for having gained any personal profit, advantage or remuneration to which such DIRECTOR or OFFICER was not legally entitled if

(a) a judgment or other final adjudication adverse to such DIRECTOR or OFFICER establishes that he in fact gains such personal profit, advantage or remuneration; or....

(3) for the dishonest, fraudulent, criminal or malicious act or omission of such DIRECTOR or OFFICER if a final adjudication establishes that acts of active and deliberate dishonesty were committed or attempted with actual dishonest purpose and intent and were material to the cause of action so adjudicated.

The language of the two exclusions must be carefully considered for purposes of deciding the current dispute. The Prior Knowledge Exclusion does not require any judgment or final adjudication, as does the fraud exclusion.

**D. Application of the Lead Third Circuit Case *Little v. MGIC***

Like a light illuminating this legal landscape, Judge Seitz's opinion in *Little v. MGIC Indemnity Corp., et al.,* 836 F.2d 789 (3d Cir.1987), definitively addressed the issue of advancement of defense costs under a D & O policy. The plaintiff in *Little* was a former corporate officer who was suing for advancement of defense costs under a D & O policy. The court in *Little* found that the policy in question was a standard liability policy, which provided that certain activities would be covered by the insurer, subject to exclusions. Specifically, the policy provided:

The Insurer agrees: (A) With the Directors and Officers of the Association that if, during the policy period, any

claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of the Directors and Officers or any of them, their heirs, legal representatives or assigns all Loss which the Directors and Officers or any of them shall become legally obligated to pay.

. . . . .

SECTION 1 —DEFINITIONS

. . . . .

(D) The term "Loss" shall mean any amount which the Directors and Officers are legally obligated to pay . . . for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgments, settlements, costs (exclusive of salaries of officers or employees), and defense of legal actions, claims or proceedings and appeals therefrom and cost of attachment or similar [* *6] bonds . . . .

*Little*, 836 F.2d at 792. The relevant exclusion in *Little* was one that stated:

(A) The Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers:

. . . . .

(5) brought about or contributed to by the dishonesty of the Directors or Officers. However, notwithstanding the foregoing, the Directors and Officers shall be protected under the terms of this policy as to any claims upon which suit might be brought against them, by reason of any alleged dishonesty on the part of the Directors or Officers, unless a judgment or other final adjudication thereof adverse to the Directors or Officers shall establish that acts of active and deliberate dishonesty committed by the Directors or Officers with actual dishonest purpose and intent [*793] were

material to the cause of action so adjudicated.

*Little*, 836 F.2d at 792–793. The court in *Little* found that the phrase "legally obligated to pay" in the policy's coverage provisions meant that the insurer's duty to pay defense costs arises contemporaneously with the director or officer's obligation to pay those costs. The court, reading the language of the exclusion, found that the fraud exclusion's language supported this conclusion, as it protected the insured from exclusions from coverage until a final adjudication of fraud occurred. The court in *Little* found,

We read [the relevant sections], as imposing upon the insurer a duty to pay loss as the insured incurs legal obligation for such loss, subject to the requirement that the insured reimburse any monies received if it is subsequently determined in a judicial proceeding that he engaged in active and deliberate dishonesty.

*Little*, 836 F.2d at 794.

The court in *Little* also addressed whether the "option clause" of the policy in question affected the insurer's obligation to pay. The clause in question provided:

SECTION 5 —COSTS, CHARGES AND EXPENSES

(A) No costs, charges and expense shall be incurred or settlements made without the Insurer's consent which consent shall not be unreasonably withheld; however, in the event such consent is given, the Insurer shall pay . . . such costs, charges and expenses.

. . . . .

(C) The Insurer [* *7] may at its option and upon request, advance on behalf of the Directors or Officers, or any of them, expenses which they have incurred in connection with claims made against them, prior to disposition of such

claims, provided always that in the event it is finally established that Insurer has no liability hereunder, such Directors and Officers agree to repay to the Insurer, upon demand, all monies advanced by virtue of this provision.

*Little*, 836 F.2d at 793. The insurer contended that this clause meant that the insurer had the discretion to advance defense costs, while the insured contended that the insurer still had the obligation to pay costs as they were incurred. Judge Seitz in *Little* found that each side's reading of the policy was a reasonable one and, as a result, there was ambiguity in the policy language, noting that Pennsylvania law provides that if an insurance policy, when viewed as a whole, is reasonably susceptible to more than one interpretation, it is considered ambiguous. *Id.*, citing *Vlastos v. Sumitomo Marine & Fire Ins. Co.*, 707 F.2d 775, 778 (3d Cir.1983). As any legitimate ambiguity must be resolved against the insurer, the court in *Little* concluded, "Thus the policy is ambiguous and must be construed against MGIC to require it to pay Little's defense costs as they come due, subject to MGIC's conditional right to reimbursement." *Id.*

The court noted that this decision was consistent with the decision in *Okada v. MGIC Indemnity Corp.*, 823 F.2d 276 (9th Cir.1986). *Okada* was a case involving the same issue and same policy language as in *Little* and the court in *Okada* also concluded that the policy language was ambiguous and ordered advance payment by the insurer. The court in *Little* noted that not every court had come to this same conclusion, but posited that any disagreement underscored the conclusion that such policy language was ambiguous. *Little*, 836 F.2d at 796. *See, e.g., Luther v. Fidelity & Deposit Co.*, 679 F.Supp. 1092 (S.D.Fla. 1986) (not requiring advancement of defense costs). At least one court in this district has interpreted *Little* as requiring the advancement of defense costs. *See*

*Fidelity Federal Savings and Loan Ass'n v. Felicetti*, 830 F.Supp. 262, 267 (E.D.Pa. 1993) (interpreting *Little* to require the advancement of corporate director's defense costs, despite his inability to repay).

### E. Contentions of the Parties Regarding the Policy Language

As held in *Little*, under Pennsylvania law, this Court must examine whether the analysis of the insurance policy offered by each party is reasonable. *Little*, 836 F.2d at 794. If it is, then the policy is ambiguous, and must be resolved against the insurer. *Vlastos*, 707 F.2d at 778. This principle is applicable to policies purchased by commercial entities. *ACandS, Inc. v. Aetna Casualty & Sur. Co.*, 764 F.2d 968, 973 (3d Cir.1985). Thus, the Court will first review the contentions of the parties regarding the language of the AEGIS policy, as presented both in the briefs and at oral argument.

The Carriers maintain that Condition T gives them the discretion to decide what defense costs to advance and that, under this discretion, they can elect not to advance any costs in this case. The Carriers also argue that they are at this time basing their decision not to advance defense costs, and attempting to exclude the Insureds from coverage, under the Prior Knowledge Exclusion only. The Carriers concede that the Fraud Exclusion, as interpreted in *Little*, would require them to advance defense costs, but maintain that the Prior Knowledge Exclusion is different from the Fraud Exclusion because it contains no requirement of final adjudication for the operation of the exclusion. At oral argument, the Carriers also suggested that the Prior Knowledge Exclusion applied to all of the Insureds, even though only John Rigas signed the policy application, due to a warranty clause and despite the severability language in the Prior Knowledge

Exclusion.[7] In addition, the Carriers argue that is unfair to place the burden of loss on them, arguing that if they were to advance defense costs, they could never actually obtain repayment from the Rigases after a conviction on the criminal charges or unfavorable judgment in the civil cases.

The Insureds contend that the issue before this Court is a coverage dispute and not an issue of allocation and, thus, Condition T does not operate here or; in the alternative, it is ambiguous and should not be applied. Since Condition T is not applicable, the Insureds contend that the Carriers do not have the discretion to deny advancement of defense costs and that an application of *Little* to the language of the relevant exclusions requires the Carriers to advance defense costs. At oral argument, counsel for Mr. Venetis also argued that the severability provision of the Prior Knowledge Exclusion means that Mr. Venetis, and by extension other directors and/or officers who did not sign the policy application, are not within the scope of the Prior Knowledge Exclusion.[8] The Insureds concede that, if defense costs are advanced, they are subject to reimburse-

ments if exclusions from coverage are found to apply.

## F. Exclusions from Coverage

■■■ Pennsylvania law governing the interpretation of insurance policies is well-settled. *Little*, 836 F.2d at 793. Where the language of the policy is clear and unambiguous, a court is required, as with any contract, to enforce that language. *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 304, 469 A.2d 563, 566 (1983). A court should attempt to interpret a policy to give effect to all of its provisions and to avoid ambiguity. *Houghton v. American Guaranty Life Ins. Co.*, 692 F.2d 289, 291 (3d Cir.1982). However, if the policy can reasonably be interpreted in more than one way, it is considered ambiguous. *Vlastos v. Sumitomo Marine & Fire Ins. Co.*, 707 F.2d 775, 778 (3d Cir.1983). Ambiguities must be construed against the insurer. *Id.*

### 1. Does Condition T Apply?

■■■ The first issue here is whether Condition T applies in this case at this time. In this case, the Carriers are attempting to deny coverage to the Insureds

---

7. Although the Court makes no finding as to the operation of this exclusion, the parties submitted supplemental materials regarding whether parties other than John Rigas could be covered by the Prior Knowledge Exclusion due to the operation of both the warranty clause in the policy applications and the severability clause in the policy itself. *Compare Westport Ins. Corp. v. Mirsky*, 2002 WL 31018554, at *13 (E.D.Pa. Sept. 10, 2002) (finding that language of prior knowledge exclusion clearly states that no coverage if "any insured" knew or should have known of misrepresentations and, thus, denying coverage), *Shapiro v. American Home Assurance Co.*, 584 F.Supp. 1245 (D.Mass.1984) (finding that policy language clearly manifests an intent to exclude insureds who did not sign policy application from coverage due to another insured's misrepresentations and thus will be

upheld), *and Bird v. Penn Central*, 334 F.Supp. 255 (E.D.Pa.1971), *on rehearing* 341 F.Supp. 291 (E.D.Pa.1972) (rejecting the "innocent" insureds' motion for summary judgment, on the grounds that the officer who made the false statement was acting as an agent for the others and thus his fraud was binding on them) *with Wedtech Corp. v. Federal Ins. Co.*, 740 F.Supp. 214, 221 (S.D.N.Y. 1990) (finding clear intent in language of policy to deny coverage only as to those individuals who committed fraud) *and Shapiro v. American Home Assurance Co.*, 616 F.Supp. 900, 903–04 (D.Mass.1985) (finding exclusion from coverage only for insured who committed fraud where policy contains provision stating that liability for each insured is independent).

8. *See supra* note 7.

based on both the Fraud Exclusion and the Prior Knowledge Exclusion. The coverage the Insureds are requesting is for the defense of various civil suits arising out of their roles as directors and/or officers. Condition T is titled "Allocation" and has as its condition precedent,

> If a CLAIM is made against both the DIRECTORS and OFFICERS and others, including the COMPANY, or if a CLAIM against the DIRECTORS and OFFICERS includes both covered and non-covered matters, the DIRECTORS and OFFICERS and the COMPANY and the INSURER shall allocate on a fair and reasonable basis ... between covered ULTIMATE NET LOSS attributable under the CLAIM against the DIRECTORS and OFFICERS and uncovered loss.

The language of Condition T, when read carefully, discusses allocation in only two scenarios: when there are a variety of parties involved *or* when there is a mix of covered and non-covered matters in a claim against a director and/or officer. All parties agree the first scenario is not implicated here.

The Carriers' counsel were clear at oral argument that although the Carriers may agree to cover some claims against some insured directors and/or officers, they are taking the position as to all five movants, that *all* claims against them are *not* covered. *See* Tr. at 58. As counsel for AEGIS stated, "that's an allocation." *Id.* The interpretation of Condition T that the Carriers suggest is that Condition T applies to all disputes over coverage, because those disputes are essentially over whether and how coverage should be allocated. This is a reasonable interpretation of the language of Condition T. The Insureds suggest an alternative reasonable interpretation of Condition T, that the Carriers have not made any allocation, but have simply denied coverage, and thus Condition T does not apply here.

There are common sense reasons supporting both interpretations. In support of the Insureds' interpretation, there is an element of unfairness, or at least ambiguity, in a policy with detailed descriptions of coverage and exclusions from coverage, but that allows the Carriers to themselves interpret one clause to allow them to unilaterally determine whether any costs are advanced. In support of the Carriers' interpretation, there is some dissonance in a policy that gives an insurer discretion over allocation disagreements where there is at least some minimal amount of coverage conceded by the insurer, but takes away all discretion from the insurer once the insurer challenges coverage entirely. Thus, under the guidance of *Little,* there are two reasonable interpretations of Condition T and, as a result, under *Little* this part of the policy must be considered ambiguous and must be construed for the Insureds.

Looking at the precise language of Condition T, there is more support for the interpretation of the Insureds than the Carriers. Condition T applies only "if a claim ... includes both covered and non-covered matters...." The Carriers have made it clear that in this case they believe that *all* of the claims against the five movants are not covered. From the literal language of Condition T, it does not apply in this case as to these movants at this time. Accordingly, the Court concludes Condition T does not apply to the present situation and, thus, the advancement of defense costs in the present case is not at the discretion of the Carriers.

### 2. Fraud Exclusion

The next step in determining whether the Carriers are obligated to advance defense costs to the Insureds is to examine

the language of the coverage exclusions at issue in this case. First, although the Carriers may later assert the Fraud Exclusion as a basis for denial of coverage, they do not dispute that *Little* controls this Court's interpretation of that exclusion and that the Carriers would be obligated to advance defense costs at this time if the Fraud Exclusion were the only basis for the denial of coverage. This Court agrees.

### 3. Prior Knowledge Exclusion

■ However, the Carriers also assert the Prior Knowledge Exclusion as a basis for denial of coverage. The Prior Knowledge Exclusion involves different language from the policy language in *Little*. The parties have not cited, and the Court has not found, any decision interpreting this precise language in the context of advancement of defense costs.

A threshold issue in reading the Prior Knowledge Exclusion is to address the definition of Ultimate Net Loss. Ultimate Net Loss, as defined in the policy, contains the condition "ULTIMATE NET LOSS does not include any amount allocated, pursuant to Condition (T), ... to non-covered matters." The structure of this sentence makes clear that all non-covered matters are not exempted from the definition of Ultimate Net Loss, rather only those non-covered matters that have been allocated pursuant to Condition T are exempted from the definition. For the reasons stated above, the Carriers have not made any allocation pursuant to Condition T as to the movants. Thus, Condition T is not applicable to the present situation and, thus, the matters about which coverage is disputed in this case are covered by the policy provisions within the definition of Ultimate Net Loss.

As noted above, the Prior Knowledge Exclusion is different from the Fraud Exclusion. One significant difference is that the Prior Knowledge Exclusion does not require a final adjudication for the exclusion to take effect. The Prior Knowledge Exclusion also does not, however, contain any language to suggest that it operates at the discretion of the insurer. It applies when a director or officer "had knowledge of a fact or circumstance which was likely to give rise to such CLAIM(S), and which such DIRECTOR or OFFICER failed to disclose or misrepresented ..." This language, on its face, does not say that the exclusion precludes the payment of defense costs when the insurer believes the insured had prior knowledge, and it does not say that the insurer can itself determine whether such knowledge was likely to give rise to claims. The language also does not say how and when such determinations should be made. The language of the Prior Knowledge Exclusion could also reasonably be read, because it does not require final adjudication, to allow the insurer to determine whether the exclusion applies. At the same time, the language of this exclusion could reasonably be read, because it uses determinative language such as "had knowledge," "was likely to give rise," and "failed to disclose," not to operate until it is judicially determined that knowledge, misrepresentation, and likelihood existed.

As above, there are common sense reasons for each interpretation of the exclusion. From the point of view of an insurer, to wait for a judicial determination of the elements listed in the Prior Knowledge Exclusion means that insurers may have to pay substantial sums for defense costs even though it is later determined there were misrepresentations in an insurance policy application. From the point of view of an insured, it is unfair to give an insurer the ability to escape its duty to advance payment merely because it asserts the Prior Knowledge Exclusion, without any judicial decision. Again, these are two reason-

able interpretations of the language of this section of the insurance policy.

*Little* is also instructive here. In *Little*, the court found that the language "legally obligated" meant that an insurer's duty to pay defense costs arises when the insured is obligated to pay those costs. That same "legally obligated" language exists in the indemnity provision, above, of the AEGIS policy. There is no dispute that the Insureds owe money to the lawyers defending the civil suits. Under *Little*, this is a legal obligation. Thus, the Carriers have a duty to contemporaneously pay defense costs, unless altered by other language in the policy. As discussed above, the parties agree that *Little* makes it clear that the Fraud Exclusion does not alter that duty of contemporaneous payment. The Prior Knowledge Exclusion, as discussed above, is ambiguous because it is susceptible to two reasonable interpretations, and thus must be construed in favor of the Insureds.

The bankruptcy court's stay prevents this Court from making any determination at this time about whether the Prior Knowledge Exclusion applies. This is of particular importance in the case of the Prior Knowledge Exclusion because the application of the Prior Knowledge Exclusion may vary as to each Insured, as John Rigas is the only one of the Insureds who signed the policy application. While the Court makes no finding as to the application of the Prior Knowledge Exclusion, it does note that at oral argument and in briefing, the parties submitted different interpretations of whether, due to the operation of a warranty clause in conjunction with the severability language in the Prior Knowledge Exclusion, only the signatory to the policy application or all of the directors and officers are subject to the Prior Knowledge Exclusion.[9]

Thus, this Court applies *Little* and Pennsylvania law to find that the Prior Knowledge Exclusion does not relieve the Carriers of their duty of contemporaneous payment of defense costs to the Insureds at this time. The Court notes that, as in *Little*, these defense costs are subject to reimbursement if the relevant exclusions from coverage are subsequently found to apply.

## IV. Public Policy Factors—Additional Reasons Supporting the Court's Conclusion

Although the Court's decision is based exclusively on the language of the policies, applying Pennsylvania law, there are a number of other reasons applicable to the availability of defense costs under a D & O policy that support the Court's conclusions:

¶ Presumption of Innocence. As noted above, three of the movants are Defendants in a lengthy federal criminal prosecution. Until and unless they are found guilty, they are presumed innocent and must enjoy the constitutionally-based prerogatives of any citizen who stands merely accused, but not convicted, of a crime. Similarly, although all five movants are defendants in numerous civil cases and, if found liable, would probably face judgments of many millions of dollars, at this moment they have not been found liable to anyone for anything.

¶ If Adelphia were not in bankruptcy, this Court could proceed to make the determinations required under the language of the policy. However, bankruptcy courts have the power to stay other related litigation, and thus the inability of this Court to make those factual determinations on the applicability of the policy exclusions at this time should not result in a windfall to either party, not contemplated as part of

---

**9.** *See supra* note 7.

the contract. However, where the policy provides for advancing defense costs, that provision should be enforceable where an exclusion that requires fact finding is not available because of the Bankruptcy Court's stay. In other words, the inability of this Court to find facts as to the exclusion should not operate to deny a benefit under the policy.

¶ An insurance policy is, of course, a contract, and both parties are entitled to receive the benefit of the bargain. The record of this case does not disclose whether the insurance carriers changed the provisions of their policy in response to Judge Seitz's landmark opinion in *Little v. MGIC.* It would be possible for carriers issuing D & O policies to explicitly reserve to themselves the unfettered discretion whether to advance defense costs—but that language does not appear in these policies. No doubt, as a matter of business common sense, the Carriers might be reluctant to issue a policy with such a draconian power, because they might find it difficult to sell such a policy in the marketplace.

¶ Three of the movants are facing serious criminal charges, and all five movants are defending against vigorous and experienced attorneys who have filed class action suits under the Securities Reform Act, 15 U.S.C. § 77 (2003), and they may also be facing proceedings brought by the Securities and Exchange Commission, and perhaps state regulators as well. As noted in the Opinion, the $300,000 per movant sought for defense costs is only to be used for the civil cases, but given the seriousness of those cases, and their complexity, it is obvious in today's marketplace that $300,000 only buys a limited amount of defense costs, but will give these five insureds a reasonable fund to pay their counsel. The court's decision is consistent with the well known black letter law, applicable to most casualty policies, that the

Court will construe an insurer's "duty to defend" more broadly than the "duty to indemnify". *See Berg Chilling Sys. v. Hull Corp.,* 70 Fed.Appx. 620, 623 (3d Cir.2003), citing *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.,* 193 F.3d 742, 746 (3d Cir.1999) ("An insurer's duty to defend an insured in litigation is broader than the duty to indemnify").

¶ Insurance carriers do not function as courts of law. If a carrier wants the unilateral right to refuse a payment called for in the policy, the policy should clearly state that right. This policy does not do so.

## V. Excess Insureds

The Court finds that given the limited scope of the referral from the bankruptcy court, and the limited issue presented at this time by that referral, that it is not necessary to make any definitive rulings as to the policies issued by the excess Carriers. Therefore, the Defendants' Motions for Summary Judgment as to Plaintiffs Federal and Greenwich will be denied without prejudice.

## VI. Rule 54(b)

At oral argument, the parties agreed that the Court's ruling on this issue should be subject to the provisions of Federal Rule of Civil Procedure 54(b). *See* Tr. at 93–98. Rule 54(b) allows a judgment on a single claim under certain circumstances, as definitively delineated in the case of *Allis–Chalmers Corp. v. Philadelphia Elec. Co.,* 521 F.2d 360 (3d Cir.1975). Rule 54(b) provides:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determi-

nation that there is no just reason for delay and upon an express direction for the entry of judgment.

Fed.R.Civ.P. 54(b). The Court in *Allis–Chalmers* stated,

> [The district court], rather than incorporating in the certificate the conclusory language of Rule 54(b), [sh]ould make a brief reasoned statement in support of its determination that, 'there is no just reason for delay' and its express direction for 'the entry of a final judgment as to one or more but fewer than all of the claims or parties' where the justification for the certificate is not apparent. . . .

*Id.* at 364. The court went on to suggest that factors a district court could consider included the nature of the adjudicated and unadjudicated claims, the possibility that future developments in the district court might moot the need for review by an appellate court, the likelihood that an appellate court might need to consider the same issue a second time, the presence or absence of a counterclaim, delay, and expense. *Id.*

In this case, there is no reason as to why, based on the interpretation of the policy as a matter of law, a judgment requiring advancement of defense costs should be delayed. In fact, there is clear prejudice to the Insureds if such a judgment is delayed, as they are still obligated to pay the defense costs they are presently incurring in defending the pending civil suits. The issue of advancement of defense costs is clearly distinct from the other issues in this case, such as rescission of the insurance policy and exclusions from coverage. This is evidenced by prior cases, referenced in the discussion above, that have addressed advancement of defense costs as distinct issues from coverage disputes under D & O Policies. In addition, the issue of advancement of defense costs will not be rendered moot by subsequent adjudication in this case addressing broader issues of coverage. Rather, as discussed above, determinations of coverage, although they may implicate reimbursement duties for the Insureds, are distinct from the Carriers' obligation to advance costs. Accordingly, as there is no just reason for delay, the entry of final judgment is appropriate within the scope of Rule 54(b), and the parties have agreed that this is the appropriate course of action, this Court will enter judgment under Rule 54(b) on the issue of advancement of defense costs.

## VII. Conclusion

The Court rejects the Carriers' attempt to refuse payment of defense costs based on coverage exclusions and rescission, all of which require further proceedings, and, thus, are subject to the stay of the bankruptcy court. The Court does not rule on the issue of rescission. The language of the AEGIS policy is ambiguous with regards to whether defense costs must be advanced pending adjudication of these coverage issues and thus, under Pennsylvania law, the policy must be construed in favor of the insured. Thus, the Rigases and Venetis are entitled to defense costs pending a determination of rescission or the policy's exclusion provisions. Accordingly, the Carriers must advance the defense costs incurred by the Rigases and Venetis, up to the $300,000 limit currently set by the bankruptcy court for each moving party.

An appropriate Order follows.

### *ORDER*

AND NOW, this 17th day of March, 2004, it is hereby ORDERED that the Motion for Partial Summary Judgment to Require Advancement of Defense Costs by Defendants John J. Rigas, Michael J. Rigas, Timothy J. Rigas and James P. Rigas

(Doc No. 14) is GRANTED as to Plaintiff Associated Electric and Gas Insurance Services, Ltd. and the Motion for Partial Summary Judgment to Require Advancement of Defense Costs by Defendant Peter L. Venetis (Doc. No. 16) is GRANTED as to Plaintiff Associated Electric and Gas Insurance Services, Ltd., and both motions are DENIED without prejudice as to Plaintiffs Federal Insurance Company of the Chubb Group of Insurance Companies and Greenwich Insurance Company.

Pursuant Fed.R.Civ.P. 54(b), judgment is hereby entered in favor of moving Defendants John J. Rigas, Michael J. Rigas, Timothy J. Rigas, James P. Rigas and Peter L. Venetis, and against Plaintiff Associated Electric & Gas Insurance Services, Ltd. in the amount of $300,000 for each Defendant, as requested in the Motion.